Checklist-Lease". Exhibit 14. "This is a funding package checklist that (our dealers) (emphasis added) use to ensure that when they provide us with a package, they have everything that we would require." Exhibit 1, page 56.

**10.** BMW requires a funding package that the lease is assigned to it, copy of any approval notification, copy of a credit application, that BMW be listed as the owner of the lease vehicle, Exhibit 1, page 20.

**11.** As the owner of the vehicle, BMW Financial Services sets the guidelines for the amount of the liability policies, Exhibit 1, page 21, Exhibit 2 paragraph 26.

**12.** "The dealer can mark up leases and we (BMW) set a money factor so the dealer knows what they can expect to receive when they assign that lease to us." Exhibit 1, page 23, page 25, Exhibit 7, paragraph 3B.

**13.** The residual value of the auto is on the lease, Exhibit 2 paragraph 11D, which is the value of the auto at lease end and the sum the lessee may purchase the lease auto at lease end. BMW sets the residual value for each auto through its guidelines and bulletins to the dealer so that they will know what BMW will accept as a residual value on the lease agreement, Exhibit 1, page 26-28.

**14.** Exhibit 2, paragraph 11 E, states Depreciation and any Amortized amount. The amount charged for the vehicle's decline in value through normal use and for other items paid over the Lease Term. BMW stated that they " . . . provides guidelines to the – to the dealers so they know what we will accept – on a lease agreement.". BMW responded "yes" when asked ". . . does BMW Financial provide information to the dealers as guidelines to arrive at the base monthly payment, Exhibit 2 paragraph 11 I." Exhibit 1, page 28-29.

11

15. When BMW was showed Exhibit 2, paragraph 10 entitled "Itemization of the amount due at lease signing or delivery" BMW was referred to line item (8) in paragraph 10 namely the Acquisition Fee in the sum of $480. When defendant was asked what an Acquisition Fee was it replied "That is a processing fee to enter into the lease." Exhibit 1, page 35. When asked who received that money the reply was "BMW Financial Services will receive all or part of that." See Exhibit 1, page 63, lines 7-13 BMW clarified its prior answer and "How much of the acquisition fee went to BMW in this Case? All $480 went to BMW Financial Services."

16. BMW when asked at the time the consumer makes a cap cost reduction, is there a credit, given by BMW at the time the lease is assigned for the $5000. Plaintiff was referring to Exhibit 2 paragraph 10 Itemization of amount due at lease signing or delivery (1) Capitalized Cost Reduction $5000. BMW response, Exhibit 1, page 30 it was not sure. During the break the deponent contacted BMW Financial Services to obtain additional information from other persons within the company, Exhibit 1, page 61. Continuing the deposition Exhibit 1, page 62 BMW stated "First question had to do with the consumer putting a cap cost reduction of $5000. and do we credit this back to the consumer. The --it's the -- I just want to make sure I understand the question. The $5000. is --is a reduced reduction and what we purchased the vehicle for is $5000 less." "The-- the--monthly payments are based on the adjusted cap cost reduction so in that sense, yes, the customer does get a **credit** for the $5000."

17. BMW requires that the consumer send a photocopy of their licenses to it or to the Dealer and the dealer is required to send it to BMW. See Exhibit 1, page 37. See also Exhibit 8 and 9 and Exhibit 1, page 38.

18. BMW provided the Dealer information with a document entitled "BMW Financial

12

Services Lease Financing Program Worksheet" Exhibit 7 for use in preparing a lease such as Exhibit 2. Exhibit 1, page 39.

In Ford Motor Credit Co. supra it did not assist in the actual negotiations, it provided the Dealers blank retail installment contracts, supplied credit forms and reviewed a prospective consumer's credit history to determine if the purchaser met its credit standards.

Ford Motor Credit Corp supra argued that it was an assignee and not a creditor. The court did not agree and held it was a creditor. In the instant case, BMW was involved in all facets of the transactions including sharing in the money, issuing credit in the sum of $5300 ($300 was CT sales tax on the $5000) plus controlled the above eighteen (18) addition steps in the transaction.

BMW's Memorandum, page 7 (1) The CLA Immunizes Defendant from Liability as "An Assignee" for Any of the Allegedly Erroneous Disclosures in the April 30, 1999 Lease, page 7-8. "The CLA states that a civil action 'may be maintained against any assignee of such creditor only if the violation or which such action or proceeding brought is apparent on the face of the disclosure statement 15 U.S.C. § 1641(a).'" BMW continues to state Memorandum, page 11-13 (2) The CLA Immunizes Defendant from Liability as a Lessor for Any of the Allegedly Erroneous Disclosure in the April 30, 1999 Lease. Again, BMW mistakenly relies on U.S.C. § 1641 (a) in the Canady, Memorandum page 12-13. That case was a credit sale and is governed by Reg. Z and TILA. This case is a *lease* and is governed by the CLA and Reg. M.

BMW continues to misunderstand the law in support of its argument that its status of protection is reached through 1642(a) as apparent on its face. That argument can survive only in a *credit sale* under TILA provided it does not conflict with Ford Motor Credit Co supra.

". . . 15 U.S.C. § 1641 (a) is part of the TILA statute, not the CLA. Jordan supra correctly

13

observed that Regulation M imposes a broader scope of liability on assignees than does 15. U.S.C. § 1641 (a).  See [Dkt 37] page 4, Judge Droney's comments. Specifically, under the Official Staff Commentary to Regulation, M, 12 C.F.R. Pt. 212.2-2(h) (3), an assignee may be a lessor for purposes of the regulation in circumstances where the assignee has substantial involvement in the lease transaction.  Schaumburg Toyota and Toyota Motor Credit Corporation, (1999 U.S. Dist. Lexis 2553) (citing Ford Motor Credit Corp.) supra.

Once the Dealer prepared the lease and sent the credit application to BMW, Exhibit 3 for approval and receives the Approval Notification Exhibit 4, from BMW that it would purchase the leased auto provided it is listed on the lease and the auto is titled in BMW's name the Dealer knew it was free of risk.

Exhibit 6, State of Connecticut Department of Motor Vehicles Certificate of Title, sets forth that BMW purchased the auto the same day the Lease was signed, Exhibit 2. The Dealer ran no risk in the transaction provide it followed BMW's procedures. BMW confirmed this by saying "If the paperwork that is received by BMW Financial Services meet our guidelines and there's no fraud involved, the dealer **can safely assume that we will purchase that vehicle and -- and pay them.**" See Exhibit 1, page 41-42.

Plaintiff's Exhibit 7, "BMW Financial Services Lease Financing Program Worksheet" ¶3B of the document, sets forth the Monthly Lease charge (1K-2F) x .00285 Rate Factor.  This charge is analogous to a finance charge under TILA.  The FRB defines this charge as the difference between "the total of the base periodic payments" and "the depreciation and amortization amounts". See Reg. M § 213.4 (f) (6).

As previously stated, BMW calculates the monthly depreciation, Exhibit 7, ¶3 (1K-2F).

14

It is "the amount charge for the vehicle's decline through normal use over the lease term and for any other items paid for over the lease term." See Reg. M § 213.4(f) (5). BMW also calculated the residual value, low mileages =% 66.00, ¶ 2 D. This is the value of the lease property at the end of the lease term and used in calculating the base periodic payment. Reg. M § 2134(f) (4).

In Exhibit 10 BMW set the excess mileage charge at ¶ D (3) $0.20; termination fee at ¶D (4) $350 and the acquisition fee at ¶ B (6) also Exhibit 2 at ¶ 10 A (8) in the sum of $480.

Exhibit 14, BMW's funding Package Checklist Lease is so detailed in lease preparation; one will note the Dealer is but a conduit for BMW and completely under its control in the leasing process. See ¶8 instructing the Dealer to use BMW FS CREDIT APPLICATION and at ¶9 CREDIT DOCUMENTATION instructing the dealer to the "Copy of FaxBack Approval" without BMW's credit approval there is no transaction.

It would defy logic to arrive at a conclusion other than BMW was the lessor in the transaction. It made all the decisions furnished the guidelines, supplied the leases, credit applications, approves the credit applications, required copies of the consumers licenses, credited the cap cost reduction to the consumer, set the acquisition fee and retained the entire $480, set the money factor, set the charge for depreciation and retained the money , set the base monthly payment and retains the money, required the consumer to insure the auto and set the insurance policy limits, set the residual value of the auto, set the excess mileage fee and retains the money if any, set the term of the lease, set the disposition fee and retains it, and purchased the car from the dealer.

Therefore, the court must find that BMW was the lessor and responsible for the lease violations as a matter of law.

15

F. **LEASE VIOLATIONS**

In the instant case the following violations exists.

1. Exhibit 2 ¶10 Itemization of Amount Due at Lease Signing or Delivery, plaintiff's Amended Complaint ¶ 8-11.

    i. Line (4) Title Fees Lease states  $50

    ii. Line (5) Registration Fees  127.50

    iii. Line (6) License Fees  18

    $195.50 Total

Compare Exhibit 13 Application for Registration, State of Connecticut, Department of Motor Vehicles VALIDATED 04/30/99

    Title  $25.00

    License Fee (No such fee exists in Connecticut)

    New (equals registration)  70.00

    $95.00 Total

The lessor BMW overcharged plaintiff $100.50 in Exhibit 2, ¶10 more than was paid to the State of Connecticut Department of Motor Vehicles Exhibit 13.

The CLA specifies that anyone failing to comply with the consumer lease disclosures requirements, see 15 U.S.C. § 1667d (a). Unlike TILA, any CLA disclosure violation leads to statutory damages see 15 U.S.C. 1640 (a).

Therefore BMW is liable as a matter of law.

2. The lessor BMW did not disclose the correct sum for the Total of Payment, Exhibit 2 ¶9 and plaintiff's Amended Complaint ¶ 12. The sum of $23772.90 is arrived at by taking the

16

sum in Exhibit 2, ¶ 7 for 36 months payments of $17447,40 plus the sum in ¶ 8 of $350 for the disposition fee plus the sum in ¶10 of $6960.15 and subtracting from ¶10 the security deposit of $500, the first months payment of $484.65 (this sum was accounted for in ¶ 7) and adjust the error of $100.50 for the overcharge of $18 license fee, overcharge of $25 title fee and overcharge for registration of $57.50. The correct sum for total of payment should have been $23,622.40. Same violation as set forth in No. 1 above.

Therefore, BMW is liable as a matter of law.

**3.** BMW failed to disclose the following: the correct sales tax on excess mileage and correct excess mileage. Plaintiffs Amended Complaint ¶13; Plaintiff's Exhibit 19; BMW's Memorandum Page 14.

Plaintiff was charge for excess mileage $1,868.20. Exhibit 18 BMW's Memorandum page 18 referring to its Exhibit A at ¶ 11 the **affidavit** of Armando Macias. Based on $.20 per miles the excess miles were 9351 over the allowed mileage of 36,025 see Exhibit 2, ¶ 18.

Assuming arguendo that BWM was correct in recording the mileage at lease termination at 45,376 (plaintiff disagrees) the Connecticut Sales Tax charge and number of excess miles charged were inaccurate.

The lease Exhibit 2, ¶3 states the end of lease date was May 1, 2002. Based on a 36 month lease the consumer-plaintiff was allocated 1000 miles per month plus credit for 25 miles that was on the odometer at the time Iannuizzis executed the lease. Exhibit 2, ¶ 5.

BMW's representative at the Rule 30 (b) (6) deposition was shown a group of documents, Exhibit 15 and was asked what they were.

**A.** "As a whole, this is a report that list all the contacts and/or information that BMW

17

Financial Services Associates made in regard to this particular account." Exhibit 1, page 58.

When asked if the information was accurate information he responded in the affirmative addressing that the individuals who wrote the information believed them to be accurate at the time of writing. Exhibit 1, page 58.

BMW stated "As far as the content of the comments, I could only assume that they are accurate." Exhibit 1, page 59. When asked if the documents were kept in the ordinary course of business the answer was "Correct. Correct." Exhibit 1, page 59. Further, when asked if one could make presumption that based on their training and experience, they should be accurate. **A.** "They should be accurate." Exhibit 1, page 59.

BMW extended plaintiff lease from May 1 to July 1, 2002 because the auto was involved in an accident the last day of the lease Exhibit 15, Bates Stamped page 48 and 53 and the auto was not used until it was returned to BMW. When BMW and plaintiff twice entered into an agreement to extend the lease for one month for a total of additional two months, BMW was obligated to allocate to plaintiff an additional one thousand (1000) miles per month for the months of May and June 2002 for a total of an additional two thousand (2000) miles. Therefore, the total miles allocated on the auto was 38,025 not 36,025 as sworn to by BMW's representative in defendant's Exhibit A, ¶ 11. The correct term of the lease, Exhibit 2, was 36 months plus the two months extension for a total term of 38 months.

In support of plaintiff's claim, see Exhibit 15, Bates Stamped page 48 a record of one of the agreed monthly extensions, ". . . vehicle was in an accident the last day of the lease and is now in a bodyshop.". "gave one month ext to help bring acct current", (emphasis added), Exhibit 15, Bates 53, July 1, 2002 "please only bill for 1m eol date. Vehc has been at dealership in

18

service dept. since 6/14." Therefore, plaintiff was overcharged 2000 additional miles at $.20 per miles and was overcharged $400 for mileage. Additionally, plaintiff was overcharged Connecticut Sales Tax at 6% of $24 on the $400. BMW failed to follow the terms of its own lease. Exhibit 2 ¶ 18. Notwithstanding BMW agreed to extend the term of the lease which it charged plaintiff, it failed to accurately calculate the terms for excess mileage; it sent plaintiff's account to a collection agency after litigation was commenced, all as a result of its own inaccuracies. Then BMW *falsified* its affidavit to this Court by failing to disclose the correct base mileage allotted to plaintiff as 38,025 see BMW's Exhibit A, ¶ 11; plaintiff's Exhibit 19.

Therefore, BMW is liable as a matter of law.

4. The lessor BMW Exhibit 2 did not disclose the correct date of the second payment or the correct date for end of the lease term, plaintiff's Amended Complaint ¶ 7. ¶3 of Exhibit 2, the date of the Lease was 04/30/99 and the end of lease date (lease term) 01/May 2002. ¶7 reads, Your first Monthly Payment of $484.65 is due on 04/30/99 followed by 35 payments of $484.65 due on the 1st of each month.

Assuming as true, the date of the lease was April 30, 1999 and the first payment of $484.65 was made on that date and the second payment was due on the 1st of each month ¶7, then the second payment was due on May 1, 1999. There would be 7 additional payments due in 1999 for a total of 9 payments for the year. The year 2000 and 2001 each would have 12 payments and 3 payments for 2002. The last payment on the lease would be due on March 1, 2002 for the month of March. Since BMW received payments monthly no payment would be due for the months of April and May 2002.

At the deposition it was brought to the attention of BMW and when asked ". . . the date of

19

the lease was 4/30/99, and they took the first payment on the same date"

**A.** "Correct."   "And, the, each subsequent month thereafter, normally, a person pays in advance?"

**A.** "That's correct."

**Q.** "But in this particular lease, the money was due, another payment was due 24 hours later. Is that standard procedure?"

**A.** "No." (Emphasis added)

**Q.** "And it was acceptable, then, to BMW that way?"

**A.** "Given human error, it was accepted."(Emphases added)

**Q.** But are you saying there was an error?"

**A.** "It would appear there is a discrepancy here because normally we wouldn't require a customer to make two payments within 24 hours." (Emphases added). Exhibit 1, Page 46-47.

The payment disclosure procedure and BMW own representative testified at the 30(b) (6) deposition ". . . **there is a discrepancy here . . . .**" Exhibit 1, page 46-47 which clearly violated the **Clear and Conspicuous standard.** "Under the CLA and Regulation M disclosures on a consumer lease must be made 'accurately and in a clear and conspicuous manner,' 15 U.S.C. § 1667a, 'in meaningful sequences,'12 C.F.R. § 213.4(a) (1), and in 'a reasonably understandable form' 12 C.F.R. pt. 213, supp. I, § 213.4(a) (1) (official staff commentary). We hade a denovo review, see Grnazzo v. G.D. Searle & Co., 973 F.2d 136, 138 (2nd Cir 1992), and we agree with the district court that the Security Pacific lease disclosures are not reasonably understandable. They are 'confusing, unduly complicated and unnecessarily convoluted . . . beyond the understanding of the average consumer.'" See Lundquist v. Security Pacific Automotive